**UNITED STATES**

v.

**Specialist Four Harry L. DOUGLAS, 414–90–7522, US Army, Company D, 864th Engineer Battalion (Construction), Presidio of San Francisco, California 94129.**

**CM 434452.**

U. S. Army Court of Military Review.

Sentence Adjudged 25 Nov. 1975.

Decided 18 Jan. 1977.

penitentiary not less than five (5) years nor more than fifteen (15) years." Tenn.Code Ann. § 39–707 (1955).

Appellate Counsel for the Accused: CPT John C. Carr, JAGC; MAJ Joe D. Miller, JAGC; LTC John R. Thornock, JAGC; COL Alton H. Harvey, JAGC.

Appellate Counsel for the United States: CPT Gregory M. Van Doren, JAGC; CPT Richard S. Kleager, JAGC; MAJ John T. Sherwood, Jr., JAGC; COL Thomas H. Davis, JAGC.

Before CLAUSE, DONAHUE and COS-TELLO, Appellate Military Judges.

## OPINION OF THE COURT

DONAHUE, Judge:

A general court-martial that included enlisted members convicted the appellant of premeditated murder of his wife (20 May 1975), two specifications of unlawfully striking his wife (25 April and 14 May 1975), unlawfully striking another soldier (14 May 1975) and wrongfully communicating a threat to injure his wife (25 April 1976), in violation of Articles 118, 128 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 928 and 934, respectively. The convening authority approved the court's sentence to bad conduct discharge, confinement at hard labor for life, forfeiture of all pay and allowances and reduction to the grade of E–1. We affirm.

The facts bearing on the Article 128 and 134 offenses are relatively simple and need not be repeated here. However, the facts

relating to the murder and the extreme complexity of gathering evidence pertaining to it needs to be set forth in some detail in view of appellant's claims at trial and before us that the Army lacked jurisdiction to prosecute him and that he was denied a speedy trial under the standards set forth in *United States v. Burton,* 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971).*

Several witnesses saw the appellant during the evening of 19 May 1975. He was dressed in fatigues, accompanied by a girl named Maria, and had been drinking. Specialist Fields was with the appellant until about 2245 hours. Specialist Hatcher, the CQ runner in appellant's unit, saw the appellant in the orderly room during the period of 2300 until 2330 hours.

One of the victim's children testified that during the evening of 19 May 1975 the victim took her children to an ice cream parlor and returned home about 2130 hours. The witness went to bed about 2230 hours. While she was in bed she heard her mother talking on the telephone. A neighbor talked to the victim on the telephone about 2245 hours.

Just before midnight of 19 May 1975 SSG James, his wife and child drove to the Baker Beach area of the Presidio. While parked at the beach he noticed that the interior light was on in a nearby Chevrolet automobile. Upon approaching this automobile, he saw the blood covered body of a heavy-set woman. Fearing for the safety of his family, he decided to take them home to their government quarters and notify the police. On the way home he saw a black man wearing fatigues walking away from the beach. Once home he called the police and then returned to the crime scene. He determined that the victim was still alive. The police did not arrive so he returned home and called them again. Returning to the beach, accompanied by his wife, he found a policeman present.

On the evening of 19 May 1975, Park Police Officers Kellison and Vrabel were on

---

* After approximately 100 days of pretrial confinement the appellant was released. Approximately 120 days elapsed between the date of the offense and the commencement of trial.

duty in the Baker Beach area. At about 2347 hours they saw the victim at the beach in an automobile with a black male. At about 0015 they returned to the area and saw other police and the body.

Among others present at the crime scene after the body was discovered was CW2 White, a CID agent. Based on photographs in the victim's wallet and other information available to him, he went to the appellant's quarters, found him in bed, and arrested him. The appellant's fatigue uniform was on the floor next to his bed when he was arrested. The appellant stated that he had seen his wife at 2315 hours. A military police investigator found a weapon on the ground outside of the appellant's quarters. Later tests showed this weapon to be the one that killed Mrs. Douglas.

Several factors indicated that the appellant was the killer and, consequently, he was placed in pretrial confinement soon after his arrest. He was promptly charged with the offenses that eventually resulted in his conviction.

█ Numerous complications precluded the immediate convening of a meaningful Article 32 investigation.

The jurisdictional status of Baker Beach was unclear without considerable research. We have determined that military jurisdiction to try the appellant clearly existed. However, diligent research by the office of the staff judge advocate was necessary on this point and it was time consuming.

In many offenses the Article 32 investigation alone functions as a primary means of gathering the evidence necessary for an intelligent disposition of the charges. However, when, as in the case *sub judice,* the charges are particularly serious and complex, there must be a high degree of reliance on professional investigators and preparers of scientific evidence. When premeditated murder is charged, the stakes are high and the degree of thoroughness of the approach must be correspondingly high. Both the government and accused persons benefit thereby.

Among the matters that needed to be accomplished in this case was the performance of various medical and laboratory tests. Of the three major types of tests, only one was by a military organization. The Necropsy Report by local civilian authorities was accomplished immediately. On 11 June 1975 the Army's CID laboratory at Fort Gordon, Georgia, accomplished various scientific tests including one that showed that the weapon found near the appellant's quarters was the weapon used in the murder. This report would have been received at the Presidio several days later. The Federal Bureau of Investigation performed neutron activation analysis tests on swabs containing samples from the appellant's hands. The report of the tests was dated 10 July 1975 and presumably arrived at the Presidio several days after that date. Its results were negative, making it a useful piece of defense evidence.

Once laboratory tests established that the weapon found near the appellant's quarters was the murder weapon, tracing the ownership of that weapon became of critical importance. Efforts before and during the investigation were unsuccessful due to lies and evasions by various witnesses. Eventually, it was established that the original owner of the weapon was a man named Rush at Fort Polk, Louisiana. Rush gave the weapon to Edwards who gave it to Evans. Evans sold the weapon to Brickhouse. Brickhouse sold the weapon to the appellant a few minutes before the murder of Mrs. Douglas. The tracing of the weapon was completed only after a world-wide search for the witnesses and Brickhouse's testimony became available only after both parties had rested and the case was reopened. It is quite conceivable that without Brickhouse's testimony that members of the court would not have been convinced beyond a reasonable doubt of appellant's guilt even though the other evidence of guilt was legally sufficient to convict. Although the CID conducted one of the most efficient and competent investigations we have ever observed, there was no opportunity to identify and make Brickhouse available earlier.

We hold that the facts in the record clearly establish that due to both the serious and the complex nature of the premeditated murder charge, "due care required more than a normal time to gather the evidence." *United States v. Henderson,* 24 U.S.C.M.A. 259, 51 C.M.R. 711, 1 M.J. 421 (1976). The government met its burden of showing extraordinary reasons for not proceeding within 90 days.

■ The appellant avers that the Army transferred its jurisdiction of the Baker Beach area of the Presidio to the Department of the Interior. In its brief the Government maintains that the Army merely granted a use and occupancy permit to the Department of the Interior, but that the beach remained within its jurisdiction. We agree with the Government's position.

We have considered and find non-meritorious the appellant's other assignment of error. The sentence is appropriate for the offense.

The findings of guilty and the sentence are affirmed.

Senior Judge CLAUSE concurs.

COSTELLO, Judge, dissenting:

I dissent. *United States v. Henderson,* 24 U.S.C.M.A. 259, 51 C.M.R. 711, 1 M.J. 421 (1976); *United States v. Marshall,* 22 U.S.C.M.A. 431, 47 C.M.R. 409 (1972); *United States v. Burton,* 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971).

Military law has worked itself into a corner; only the Court of Military Appeals can extricate it. The corner is bounded on one side by the *Marshall* decision, on the other by *Henderson,* both cited above. *Marshall* was a limited-objection opinion which has been too widely used and *Henderson* built a wall of procedural norms which totally ob-

scure the purpose and substantive content of prior law. Even now the law is being pushed further into the confining corner by a combination of insufficient pleading below [1] and a narrowing of emphasis by the Court of Military Appeals which I believe to be more a product of personnel turbulence and those same pleading defects than the necessary progress of the law from prior jurisprudence. [2]

Though the *Burton* case was the trigger for this situation, that case neither caused nor required the present position. It is true that the *Burton* court fashioned a harsh remedy for pretrial delays (dismissal). Nevertheless its conclusions about the need to act were quite predictable and the military law on which the Court relied was fairly chosen and supportive of those conclusions. Also the Court was scrupulous in identifying the considerations which had to precede use of its remedy. Among the principal elements of prior law chosen by the Court in fashioning its remedy were that no rigid time limits were to be fixed for the processing of cases; that each case would turn on its own facts and circumstances; that the time between confinement and trial is but one of those circumstances and that the matter of consequent harm to the accused was relevant.

After amassing these considerations the Court tested them against the language and history of Article 10, UCMJ. Finding no inconsistencies, the Court announced its now familiar rule:

" . . . a presumption of an Article 10 violation will exist when pretrial confinement exceeds three months. In such cases, this presumption will place a heavy burden on the Government to show diligence, and in the absence of such a showing the charges should be dismissed." [3]

1. *See* Judge Ferguson's remarks about the state of the record in *Henderson* and our decision in *United States v. Walker,* 50 C.M.R. 213 (A.C.M. R.1975).

2. About the turbulence: Judges A, B and C participated in the leading case, *Burton,* but C dissented. Then Judges A, B and D unanimously decided *Marshall.* Finally, but only 3

years later, Judge C returned to the Court and wrote the majority opinion in *Henderson,* joined by Judge E. Judge F dissented.

3. The three months period here was clarified to 90 days in *United States v. Driver,* 23 U.S.C. M.A. 243, 49 C.M.R. 376 (1974).

The *Burton* majority then affirmed the conviction despite 149 days of pretrial confinement, after examining the record for evidence of harm to the appellant and finding none. The dissenting judge found that most of the delay was the product of "administrative bungling," an inadequate explanation in his view. Regardless of the view a court might take today on the facts of *Burton*,[4] it is clear that the court which first fashioned the remedy saw it as one to be imposed after a weighing of competing interests—personal and societal. The process adopted by the Court involved some fact-finding, some assessment of the relative significance of established fact and a final judgment under law.

Patently, there is little in the more recent speedy processing cases which reflects this fundamental notion of assessment and judgment. Instead we have reached a hair-splitting numbers game in which grown men add two, subtract three and dispute over four other days in an effort to bring an adjusted trial date within a date less than 90 days from the inception of pretrial confinement. The product of this haggling is then presented as equal to or less than 90, in which case it may be followed by a triumphant announcement that no one's important rights have been trampled upon. If the result is one day over 90, a difference of 11 one-thousandths of the total, we must dismiss the charges and proclaim the vindication of freedom and the American Way.

This condition was presaged by the decision in *Marshall*. There, a changed and perhaps properly impatient court decided that the system's response to *Burton* had been less than fulsome. Consequently, a unanimous court decided that the Government had failed to overcome its heavy burden of showing diligence, thus failing to rebut the presumption of a violation of Article 10, and necessitating dismissal of the charges. The Court's emphasis on the diligence aspect of the *Burton* decision when it was trying to discipline the system

was understandable and proper. Unfortunately it was not understood and the military legal profession began to spend more time counting days than do promiscuous teenage females.

After *Marshall,* the natural tendency of cases to follow one another operated. Its culmination came in *Henderson* when a convicted murderer was freed because the Government failed to persuade the court of its diligence during the 132 days from incarceration to trial. Because *Burton* established a duty for judges to make jury-type decisions, the outcome of any particular case in this area is beyond cavil. However, the general framework within which appraisals are made is subject to analysis.

The author judge in *Henderson* reminded us forcefully that *Burton* "is the law" and that we have a duty to follow it. The same opinion tells us that "*Marshall* decided nothing new, and neither expanded nor limited the *Burton* test." *Henderson, supra,* n.8. However, the *Henderson* opinion was concerned primarily with rebutting the two principal Government contentions in support of the conviction: a serious or complex offense exception and a foreign country exception to the *Burton* 90–day rule. The *Henderson* court was unable to find any facts of record supportive of the Government view, even though this Court had done so. Again, quibbles with jury-type findings are unbecoming; this description is only scene-setting.

*Henderson* is significant for what does not occur in the opinion. Without the reason to teach or discipline which the *Marshall* court seemed to have, the *Henderson* court went the same route. Only one part of *Burton* was invoked, the fixed time period used in that opinion to say as of when one set of appraisals should be made.[5] The text accompanying note 7 in the *Henderson* opinion says that the presumption of an Article 10 violation after the net delay of 113 days " . . . may be rebutted *only*

---

4. Many less startling periods of delay have resulted in dismissals since *Burton*.

5. Recall that an accused may demand trial within the 90–day period and trigger important decisions then.

if the Government succeeds in shouldering its heavy burden to show diligence." [Emphasis supplied.] Chief Judge Fletcher's dissenting opinion pointed out that, by abandoning the *Marshall* exceptions of complex and overseas offenses as advanced by the Government, the *Henderson* majority made " . . . the *Burton* rule all but insurmountable." Actually, the majority did not reject the *Marshall* exceptions, they simply were not found to be present in the record, whereas the Chief Judge was able to satisfy himself on those same points from the same record.

What concerns me is that no one spoke about the rest of *Burton*. This may be another instance of deficiencies in the record or pleadings, but I do not remember any evidence in that record that *Henderson* was personally injured by an extra 23 days in pretrial confinement, that there were any other circumstances during the period of delay which hurt him or his defense[6] or that 113 days was unreasonably long as a general rule in such cases. *Burton* said that all of these things should be considered in deciding whether the presumption of a violation was overcome. These are all things which have to do with the personal circumstances and rights of the accused, but consideration of them has been neglected.

On the other hand, the Government has been trying to show "diligence" which is a relative and abstract notion if ever there was one. Patently there will never be Government resources sufficient to insure that every action against each accused in a jurisdiction will follow immediately on the heels of its predecessor. Instead the prudent prosecutor allocates his resources according to his list of priorities. Even among those in jail, a "first priority" group, choices will have to be made and gaps in the progress to trial of individual cases will occur. Maybe 90 days is a good central figure to allow for this in moderation and maybe it is not. In any event, if we can tolerate a few days here and a few there, it is manifest that 90 is not at all times and all places the one correct number. I think the *Burton* court viewed it as a watershed. Pre-90th day days are questionable only in rare cases; post-90th day days are freely questionable and require defense, but a definition of constitutional (or worse) injury is not so easily found as merely distinguishing between 90 and 91.[7]

I dissent, even though what my brothers have done here is quite close to the spirit of *Burton*. In my view, only one part of *Burton* is still viable under *Henderson* and its construction of *Marshall*. The mechanical analysis established by *Henderson* requires dismissal of these charges, though I have yet to feel the warm glow of courage and rectitude such action produced for the majority in that case.

The newly constituted Court of Military Appeals has a perfect opportunity here to return to the broad soundness of the landmark decision in *Burton*. That decision was timely, but in the vanguard of American legal thought, predating the Speedy Trial Act by three years. Our pride in it can be easily tarnished by misapplication.

As my brothers here have pointed out, this case could have been tried sooner. However, the delay is not obviously or oppressively long and the record shows no injury to appellant.[8] What is perhaps the most significant point is that, had the Government been forced to trial at 90 days,

---

6. Suppose an Article 32 Investigation was being held three days after a crime. Before his testimony could be taken, a key witness dies. Then it takes 100 days to get to trial. Can it be said that the death of that witness is in any way relevant to the delay?

7. *Driver,* supra, n.3, exemplifies the flexible tests of reasonableness and injury contemplated by *Burton.* That court seemed to choke on the notion that such a difference could be so significant. Thus the court which set the 90–

day period said immediately that it didn't apply to the case before it.

8. I could not defend a rule which required an accused person to risk conviction by trial in order to test a claim of prejudice in support of his speedy trial motion. However, once the trial has been held, its course is the most fruitful source of evidence of the impact of pretrial events.

accused might have faced conviction on a highly circumstantial case. The delay contributed to locating conclusive evidence of his guilt, but for all the Government knew the same witness could have produced a startlingly different result. Just as x-rays are said to both cause and cure cancer in appropriate applications, delays before trial have bi-polar potentials. Let the judges, not the mathematicians, decide our cases.